IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-30

No. 208A21

Filed 18 March 2022

IN THE MATTER OF: A.E.S.H.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from an order entered on 15 February 2021 by Judge Mack Brittain in District Court, Henderson County. This matter was calendared for argument in the Supreme Court on 18 February 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Susan F. Davis for petitioner-appellee Henderson County Department of Social Services.*

*John H. Cobb for appellee Guardian ad Litem.*

*David A. Perez for respondent-appellant father.*

EARLS, Justice.

¶ 1    Respondent-Father appeals from an order terminating his parental rights in his child, A.E.S.H. (Andrew).[1] We affirm the trial court's order.

## I.    Background

¶ 2    Andrew was born in August 2009. On 17 January 2019, when Andrew was nine

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading. Andrew's mother is deceased.

years old, the Henderson County Department of Social Services (HCDSS) filed a juvenile petition alleging that Andrew was a neglected and dependent juvenile, based on conditions observed the day before when the Henderson County Sheriff's Department responded to a medical call at the family's residence in Mills River, North Carolina, relating to Andrew's mother.

However, that was not the first time that Andrew's family had been involved with social services. In 2017 and 2018, when they lived in Asheville, North Carolina, the Buncombe County Department of Social Services (BCDSS) was involved with the family because of the parents' alleged substance abuse, unsanitary conditions in the home, specifically the presence of animal feces, and reports that Andrew had poor hygiene and attended school smelling dirty.

After Andrew's family moved to Mills River, North Carolina, HCDSS received a report on 14 November 2018 concerning the unsanitary condition of that home including animal feces throughout the house. HCDSS closed this case in December 2018 after the family was provided resources and cleaned up the home.

On 16 January 2019, when officers responded to the medical call, they stated that Andrew's mother's condition was so shocking she "looked like something out of a horror movie." According to the officers, her body was swollen and she was lying in her own waste. Andrew's mother was diabetic, bedridden, and suffered from degenerative bone disease. After refusing to take her medication, she was transported

to the hospital. The officers saw animal feces throughout the home and noted a strong odor of ammonia due to cat urine.

¶ 6     That same day, HCDSS became involved. HCDSS learned from the officers that Andrew's mother was unresponsive and on a ventilator in the Intensive Care Unit at Pardee Hospital. HCDSS also learned that upon her arrival at the hospital, she was diagnosed with alcohol dependence, multiple organ failure, internal bleeding, and had feces between her toes.

¶ 7     A HCDSS social worker visited the home where they also observed animal feces throughout the living areas. They noted there was a hole a few inches wide in Andrew's room leading to the exterior of the home. Andrew explained that cats come in and out through the hole, and he was trying to fix it as they were touring the home. Andrew appeared and smelled dirty and he had not eaten all day. There were empty beer cans throughout the home and piles of beer cans on each side of the bed. Respondent-father admitted that Andrew's mother had been bedridden for at least six days, during which time she refused food and medicine and defecated and urinated on herself in the bed. Respondent-father further acknowledged that he had been sleeping in the bed with her and that uncleanliness also led to her bleeding from her private area. Andrew told the HCDSS social worker that his mother had been trying to eat cigarettes, her phone, and pillows.

¶ 8     HCDSS social workers also were concerned about the family's obviously

malnourished dog whose ribs were visible. Respondent-father was arrested at the home that day and charged with felony cruelty to animals. Just two days earlier, on 14 January 2019, respondent-father had been indicted on sex offense charges. At the time of his arrest for felony cruelty to animals, respondent-father was a registered sex offender and had nine previous convictions of taking indecent liberties with a minor for incidents that occurred between 2005 and 2009. None of these incidents involved Andrew.

¶ 9        HCDSS social workers sought to speak with both respondent-father and Andrew's mother on 16 January 2019 about alternative placements for Andrew and plans for his care. However, Andrew's mother was too ill to be interviewed. Respondent-father was unable to name any appropriate placements for Andrew or develop a plan for his care. On 17 January 2019, Andrew's mother passed away and Andrew was placed into HCDSS custody where he has remained ever since.

¶ 10       The trial court adjudicated Andrew neglected following a hearing on 7 February 2019, at which respondent-father was present.  The court granted custody to HCDSS, and placed Andrew in foster care. The trial court determined that Andrew was a neglected juvenile for three reasons: (1) Andrew was residing in a home that was unsuitable due to filth, (2) Respondent-father's substance abuse, and (3) Respondent-father's parenting issues. The primary permanent plan was reunification, and the trial court ordered respondent-father to complete a

reunification plan in order to regain custody.

On 28 February 2019, respondent-father was arrested for felony domestic neglect of a disabled or elder person and misdemeanor child abuse. Although released on bond a month later, respondent-father was subsequently rearrested in April 2019 pursuant to a bill of indictment and was convicted in August 2019 of felony cruelty to animals, felony domestic neglect of a disabled or elder person, and misdemeanor child abuse. He was released from the Department of Corrections on 15 August 2020.

Review hearings were held on 9 May 2019, 8 August 2019, and 2 July 2020. After each hearing, the trial court entered an order finding that respondent-father had not made adequate progress within a reasonable time under the reunification plan. On 12 August 2020, HCDSS moved to terminate respondent-father's parental rights in Andrew.[2] In support of its motion to terminate respondent-father's parental rights, HCDSS alleged that: (1) Respondent-father neglected Andrew, and it was probable there would be a repetition of neglect if Andrew were returned to Respondent-father's care, *see* N.C.G.S.§ 7B-1111(a)(1) (2021); and (2) Respondent-father had willfully left Andrew in foster care for more than twelve months without showing reasonable progress under the circumstances to correct the conditions that

---

[2] Although this 12 August 2020 motion in the cause was voluntarily dismissed without prejudice on 10 November 2020, a renewed motion in the cause seeking the same relief was filed the next day that was identical except for the addition of an allegation that "the father has been in and out of prison during the lifetime of the juvenile."

led to Andrew's removal, *see* N.C.G.S. § 7B-1111(a)(2) (2021).

The motion to terminate respondent-father's parental rights was heard on 4 February 2021. On 15 February 2021, the trial court entered an order terminating respondent-father's parental rights, on two grounds. First, pursuant to N.C.G.S. § 7B-1111(a)(1), the trial court found that respondent-father neglected Andrew, and there is a probability that such neglect would recur if Andrew was returned to respondent-father's care. Second, pursuant to N.C.G.S. § 7B-1111(a)(2), the trial court found that Respondent-father willfully left Andrew in foster care for more than twelve months without showing to the satisfaction of the court that reasonable progress under the circumstances had been made in correcting the conditions which led to Andrew's removal. The trial court determined it is in Andrew's best interests that Respondent-father's parental rights be terminated. Respondent-father appeals.

## II.   Analysis

Respondent-father's first argument on appeal is that the trial court erred in terminating his parental rights in Andrew based upon neglect pursuant to N.C.G.S. § 7B-1111(a)(1). Respondent-father contends that the trial court's findings of fact were insufficient to establish that there is a probability that his neglect of Andrew is either continuing or likely to reoccur in the future. Respondent-father also argues that because some of the trial court's challenged findings of fact relating to its determination of neglect are unsupported by clear and convincing evidence, the trial

court erred in concluding that his parental rights in Andrew were subject to termination. We hold that the trial court's findings are supported by the evidence and are sufficient to support its determination that there is a likelihood that Andrew would be neglected in the future if returned to respondent-father's custody.

¶ 15     A trial court may terminate an individual's parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B- 1111(a)(1). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). "Termination of parental rights based upon this statutory ground [under N.C.G.S. § 7B-1111(a)(1)] requires a showing of neglect at the time of the termination hearing . . .." *In re D.L.W.*, 368 N.C. 835, 843 (2016). A prior adjudication of neglect is not determinative in a termination-of-parental-rights proceeding. *In re J.W.*, 173 N.C. App. 450, 455 (2005); *In re Stewart*, 82 N.C. App. 651, 653 (1986).

¶ 16     However, "if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. at 843. This is because "in most termination cases the children have been removed from the parent['s] custody before the termination hearing." *In re Beasley*, 147 N.C. App. 399, 404 (2001). In such a situation, "[a]

parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. 865, 870 (2020) (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018)). The trial court may also look to the historical facts of a case to predict the probability of a repetition of neglect. *In re McLean*, 135 N.C. App. 387, 396 (1999).

¶ 17    Here, Andrew had been in HCDSS's custody since 16 January 2019. The trial court found that the circumstances contributing to Andrew's foster care placement were respondent-father's substance abuse, his parenting issues, and the fact that Andrew was residing in a home that was unsuitable and filthy. After Andrew was adjudicated neglected on 7 February 2019, Respondent-father was granted supervised visits for a minimum of one hour per week, scheduled on Mondays from 3:30 p.m. to 4:30 p.m. respondent-father was required to give HCDSS a 24-hour advance confirmation that he would attend the visit. To work toward reunification with Andrew, the trial court ordered respondent-father to complete several requirements including drug screens and parenting classes.

¶ 18    We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed

conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). We note that the "trial court need not make a finding as to every fact which arises from the evidence; rather, the court need only find those facts which are material to the resolution of the dispute." *Witherow v. Witherow*, 99 N.C. App. 61, 63 (1990), *aff'd per curiam*, 328 N.C. 324 (1991). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

¶ 19 On the issue of neglect, respondent-father primarily argues that the findings of fact are not sufficient to establish that there is a probability of a repetition of neglect in the future. The findings respondent-father addresses include the following:

> 27. During the time [Respondent-father] was not incarcerated he was asked to submit to one drug screen. On April 5, 2019, he tested positive for Methamphetamine.

> 28. [Respondent-father] failed to engage with and complete a parenting class during his incarceration or at any time when he was not incarcerated. [Respondent-father] was given the opportunity to participate in a parenting class while incarcerated, but failed to do so.

> . . . .

> 30 [Respondent-father] was directed to pay child support. That obligation was suspended during his times of incarceration. However, [Respondent-father] paid $0.00 in support, either directly or indirectly during the times he was not incarcerated.

> . . . .

> 33. [Respondent-father] continues to have no known income or employment.
>
> 34. [Respondent-father] continues to have no known residence that is suitable for [Andrew]. On November 5, 2020. [Respondent-father] told the Social Worker he is "fixing up" the residence and would contact her when the home was ready. [Respondent-father] has not followed up with the Social Worker concerning his residence.

Concerning finding of fact 27, respondent-father argues that there is no record evidence to establish that he used any drugs after the date of his only drug screen on 5 April 2019, which occurred some twenty-three months before the termination hearing. While this is true, finding of fact 27 concerning the failed drug screen is only one of numerous findings. Although standing alone the prior drug use may be fairly remote in time, it is part of the context the court properly took into account.

Next, respondent-father argues that findings of fact 28, 30, and 33 are insufficient because they do not address whether his conduct at issue was willful. As to finding of fact 28, concerning the completion of parenting classes, respondent-father's contention is contradicted by the record. Cynthia Brewer, a correctional case manager with the North Carolina Department of Public Safety, Division of Prisons, who conducts the parenting classes at the facility where respondent-father was incarcerated, testified at the termination hearing that after respondent-father's inquiry into parenting classes, she told him that he could put his name on a list if he was interested. Respondent-father inquired about how many merit days he would

earn for attending the parenting classes and Ms. Brewer explained that she was only looking for people to participate in the program who wanted to become better fathers. When Ms. Brewer received the list of the names for the class, respondent-father's name was marked off the list. Because respondent-father was given an opportunity to participate in a parenting program while incarcerated, and Ms. Brewer's list ultimately showed that respondent-father's name had been removed, the trial court's finding that he failed to comply with the requirement of his reunification plan which ordered him to engage in and complete a parenting class during his incarceration is supported by clear and convincing evidence. Respondent-father's conduct in failing to sign up for the parenting class after being given the opportunity to do so is sufficient evidence of willfulness.

¶ 22    Additionally, Andrew's social worker, Gina Warren, testified at the termination hearing that after respondent-father was released from incarceration on 15 August 2020, she informed him of numerous parenting classes available for attendance. In a letter from 6 October 2020, Ms. Warren referred respondent-father to six agencies that facilitated local and online parenting courses. During a face-to-face interaction with Ms. Warren on 5 November 2020, respondent-father confirmed he had received the October letter from Ms. Warren but requested that she resend the letter. Ms. Warren mailed the letter the next day again listing the six agencies offering parenting classes. Ms. Warren followed up to inquire about respondent-

father's progress with engaging and completing a parenting program in letters dated 14 December 2020 and 25 January 2021. Respondent-father failed to respond to her letters to inform her of his progress in completing or even starting a parenting program. This evidence further supports the trial court's finding that when not incarcerated, respondent-father failed to engage in and complete a parenting class. Respondent-father's failure to even begin a parenting class, and his failure to respond to Ms. Warren's inquiries about his progress after being informed of several classes available to him, constitutes sufficient evidence of willfulness.

¶ 23        Turning to findings of fact 30 and 33, respondent-father contends that these findings do not sufficiently support the conclusion that Andrew would be likely to be neglected in the future because there is no showing that he willfully did not pay child support or willfully remained unemployed. However, for a finding of likelihood of future neglect, the relevant question is whether respondent-father will be able to provide for his son. *See, e.g., In re K.L.T.,* 374 N.C. 826, 831 (2020), ("The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding.") (quoting *In re K.N.,* 373 N.C. 274, 282 (2020)).

¶ 24        Finally, respondent-father disputes finding of fact 34 on the ground that the evidence does not support the finding that his residence was unsuitable. The record shows that Ms. Warren made numerous attempts to inspect respondent-father's

residence after he was released from incarceration. Ms. Warren testified at the termination hearing that she last discussed with respondent-father the suitability of a residence for Andrew on 5 November 2020 and had not heard anything about the condition of the home in four months. On 5 November 2020, during a face-to-face meeting, Respondent-father told Ms. Warren that he was "fixing up" his grandmother's residence and would contact her when it was ready because he did not want her to see it unfinished.

Thereafter, Ms. Warren mailed respondent-father three letters inquiring about the condition of his residence. In a 6 November 2020 letter, Ms. Warren asked respondent-father to please contact her about a home visit when he felt the home was suitable. Receiving no response, Ms. Warren mailed a letter to respondent-father on 14 December 2020 inquiring if respondent-father had made any progress toward making the home appropriate. Again, receiving no response, Ms. Warren mailed another letter on 25 January 2021 asking respondent-father to communicate with her and inquiring if he had made any progress toward making the home suitable for Andrew. Ms. Warren testified that although she knew the address of the grandmother's residence, she had not seen the home because respondent-father had not called her to schedule an appointment to conduct a home study nor invited her to see the home. Because respondent-father told Ms. Warren that he would contact her regarding the suitability of his grandmother's residence for Andrew and failed to

communicate with and respond to Ms. Warren's attempts to conduct a home assessment, the trial court's finding that respondent-father did not establish a suitable residence for Andrew is supported by clear and convincing evidence. Importantly, this failure is material to a determination of whether there is a probability of repetition of neglect because the condition of respondent-father's previous two residences led to social services' involvement, Andrew's adjudication as a neglected juvenile, and respondent-father's conviction for misdemeanor child abuse on 28 February 2019.

¶ 26       In sum we conclude the trial court's challenged findings of fact are supported by clear, cogent, and convincing evidence. Further, the trial court's findings of fact support the conclusion that respondent-father neglected Andrew and that, based on the circumstances as they existed at the time of the hearing, it is probable that there would be a repetition of neglect if Andrew was returned to respondent-father's care. Because the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, *see In re A.R.A.*, 373 N.C. 190, 194 (2019), we need not reach the issue of whether the trial court erred in terminating respondent-father's parental rights pursuant to N.C.G.S. § 7B-1111(a)(2). Respondent-father does not contest the trial court's determination that, pursuant to N.C.G.S. § 7B-1110, it is in Andrew's best interests to terminate Respondent-father's parental rights.

### III.     Conclusion

We hold that the trial court did not err in determining that there is a probability of a repetition of neglect if Andrew was returned to respondent-father's custody, and that the existence of this ground for termination is sufficient to support the termination of Respondent-father's parental rights. The trial court's order terminating Respondent-father's parental rights in Andrew is therefore affirmed.

AFFIRMED.